UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GREG KUEBEL, on Behalf of Himself
and ALL Others Similarly Situated,

                        Plaintiff,

                                                08-CV-6020T

                v.                        **DECISION
                                           and ORDER**

BLACK & DECKER (U.S.) INC.,

                        Defendant.
_____

## <u>INTRODUCTION</u>

Plaintiff, Greg Kuebel ("plaintiff" and/or "Kuebel"), a Retail Specialist and former employee of defendant Black & Decker (U.S.) Inc., ("Black & Decker" and/or "defendant") instituted this action alleging the defendant of the following: (1) Violation by Black & Decker of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §201 *et seq.* ("FLSA"); (2) Retaliation in violation of the FLSA; (3) Violation of the New York Labor Law, §190 *et seq.*;[1] and (4) Retaliation in violation of the New York Labor Law ("NY Labor Law"). Specifically, plaintiff claims that defendant failed to pay wages to which he was legally entitled because of time he spent commuting between his daily work location ("Commute Time") and time he worked "off the clock" but was not recorded on his time sheets ("off-the-clock" claims).

---

[1]The Court notes that the portions of the New York Labor Law relied upon by plaintiff do not depart substantially from the requirements of the FLSA. Accordingly, although the following analysis refers primarily to federal law, it applies equally to the plaintiff's state law claims. See Bennett v. Progressive Corp., 225 F.Supp.2d 190, 215 (N.D.N.Y. 2002); Bandhan v. Lab. Corp. of America, 234 F.Supp.2d 313, 316, n. 2 (S.D.N.Y.2002); see generally Brown v. Tomcat Electrical Security, Inc., 2007 WL 2461823, at *6 (E.D.N.Y.2007).

Plaintiff initially moved for conditional class certification for violation of the FLSA claiming that he was similarly situated to all other Retail Specialists of Black & Decker as it relates to defendant's failure to compensate for Commute Time. The parties thereafter stipulated to conditional certification *solely* as to the Commute Time pay issue. Notice was sent to potential plaintiffs and 130 opt-in plaintiffs filed consents to join the Commute Time claim. On December 3, 2008, defendant moved for partial summary judgment for dismissal of plaintiff's Commute Time claims, which was granted by this Court. Now pending are motions made by both plaintiff and defendant, which the court will set forth in the order in which they were filed.

Defendant filed a Motion For Notice to Opt-In Collective Action Plaintiffs informing them that the collective action claims brought by Kuebel have been decided in defendant's favor and have been dismissed. Plaintiff opposed this motion and filed a Motion seeking permission to send supplemental notice to all Retail Specialists and Sales and Marketing Specialists employed by Black & Decker to inform them of the "off-the-clock" claim by Kuebel, which defendant opposes. In addition, defendant filed a Motion for Summary Judgment under Federal Rules of Civil Procedure 56 dismissing all of plaintiff's remaining individual claims, which plaintiff opposes.

Defendant contends that plaintiff abandoned his retaliation claims under the FLSA and the NY Labor Law because plaintiff did not respond to defendant's arguments concerning these claims in his opposition to defendant's summary judgment motion. Courts generally consider claims

waived or abandoned when not fully briefed on a summary judgment motion. See Barlow v. Connecticut, 319 F.Supp.2d 250, 266-67 (D.Conn.2004) (Courts may deem abandoned any claims not fully briefed in a motion for summary judgment). Whether to do so is within the discretion of the court. See Lipton v. County of Orange, 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") In Taylor v. City of New York, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) the court stated that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment [on one ground] and the party opposing summary judgment fails to address the argument in any way." See also Fed.R.Civ.P. 56(e)(2). Here, defendant moved for summary judgment, but plaintiff did not address defendant's argument concerning dismissal of the retaliation claims in its response. Accordingly, the court finds that plaintiff abandoned both retaliation claims under the FLSA and the NY Labor Law and grants defendant's motion for summary judgment dismissing these claims.

For the reasons set forth below, I grant defendant's motion for summary judgment, and dismiss plaintiff's remaining individual claims since plaintiff cannot, as a matter of law, establish the necessary elements of proof in support of the alleged claims. The two remaining motions: defendant's Motion For Notice to Opt-In Collective Action

Plaintiffs and plaintiff's Motion for Supplemental Notice to Putative Plaintiffs are denied as moot.

<u>BACKGROUND</u>

Defendant previously filed a motion for partial summary judgment requesting that the Court dismiss plaintiff's Commute Time claims. <u>See Kuebel v. Black & Decker</u>, 2009 WL 1401694 (W.D.N.Y. May 18, 2009) ("May 2009 Decision"). The Court granted defendant's motion for reasons set forth in its May 2009 Decision. The facts of this case were set forth in the Court's May 2009 Decision, familiarity with which is presumed and therefore are not repeated in their entirety here. Accordingly, only the facts relevant to the instant motions are discussed below.

I.    **Procedural History**

A.    **Plaintiff's Remaining Individual Claims**

On January 10, 2008, plaintiff filed a Collective Action Complaint, which along with an Amended Complaint alleged four causes of action namely: (1) violation of the FLSA; (2) retaliation in violation of the FLSA; (3) violation of the NY Labor Law; and (4) retaliation in violation of the NY Labor Law. <u>See</u> Docket #s 1 and 68. In his first and third claims, plaintiff alleges that defendant failed and has refused to pay him wages to which he was legally entitled for Commute Time and off-the-clock claims. <u>See</u> <u>id.</u> On December 3, 2008, Black & Decker moved for partial summary judgment seeking dismissal of plaintiff's Commute Time claims, which the Court granted in its entirety. In so doing, the Court held that defendant's Commute Time policy was lawful, tasks

performed at home were neither "principal activities" nor "integral and indispensable" to Retail Specialists' jobs, and that defendant's conduct was not willful. <u>See</u> May 2009 Decision. Therefore, the only remaining claims in this lawsuit are plaintiff's off-the-clock claims.

**B.    Status of Certification of Collective and Class Action**

A notice was sent on August 26, 2008 to all former and current Retail and Sales and Marketing Specialists who were employed by Black & Decker at any time between June 1, 2005 to the present permitting them to join plaintiff's FLSA action for Commute Time pay. This resulted in 130 individuals who opted-in to join plaintiff's Commute Time action. Defendant has moved to send these individuals a notice of dismissal of the Commute Time pay claim. Plaintiff, in turn has moved for supplemental notice to inform putative plaintiffs of the FLSA "off-the-clock" claim.

**II.    <u>Factual Background</u>**

**A.    The Parties**

Black & Decker is a worldwide manufacturer of power tools which sells products under a number of brand names. In addition, defendant employs Retail Specialists who are responsible for product merchandising and marketing within Home Depot stores. Plaintiff was a Retail Specialist for Black & Decker from September 2006 to June 2007. In this position, he was directly supervised by a Market Manager, who

oversees Retail Specialists within a territory called a "market."[2]
Plaintiff was also employed by three other companies during the same
time he was working for Black & Decker. He did field merchandising in
Best Buy stores for 4-12 hours per week for a company called Mosaic, 1-
4 hours per week for a company called Campaigners and occasional
merchandising as an independent contractor for the Pat Henry Company.
In addition, plaintiff had childcare obligations while employed by
defendant, including taking his children to gymnastics class during the
workweek. Defendant claims that plaintiff was terminated less than a
year into his employment with Black & Decker for poor performance and
falsification of company records. Plaintiff argues his termination was
in retaliation for his complaints over failure to pay overtime
compensation and because he had limited himself to working only 40
hours per week.

B.    **Plaintiff's work-related Duties and Responsibilities**

The plaintiff's principal job duties as a Retail Specialist, was
to ensure that Black & Decker products were properly stocked, priced
and displayed within the space that he or Black & Decker negotiated in
each of his six assigned Home Depot stores. Moreover, plaintiff
provided product knowledge training sessions to store personnel and
engaged in in-store sales conversations with Home Depot customers that
were interested in Black & Decker's products. See id., 10. Importantly,

---

[2]Uzo Idigo ("Idigo") was plaintiff's Market Manager from September 2006 to January 2007. Scott Davolt ("Davolt") was plaintiff's Market Manager from late January 2007 until plaintiff's employment was terminated on June 15, 2007.

the essential functions of plaintiff's job were to ensure that his six Home Depot stores were "fundamentally sound." This meant plaintiff had to make sure that: (1) the Black & Decker products in the store were priced correctly; (2) the product fact tags were accurate and properly displayed; (3) the Black & Decker products were adequately stocked; and (4) the Black & Decker products were clean, on the shelves and on display, and (5) the Black & Decker tool display was set in the pod correctly. Plaintiff contends that the essential functions of plaintiff's job also included office time or administrative duties consisting of: reviewing and responding to company e-mails, reviewing directives from managers, printing and reviewing sales reports, training on the Black & Decker website via E-learning courses,[3] assembling point-of-purchase ("POP") materials and synchronizing the company-provided Personal Digital Assistant ("PDA").[4]

Defendant contends that the time it takes Retail Specialists to perform their administrative tasks may vary depending on their individual responsibilities. However, Black & Decker expected retail Specialists to generally allot 2.5 hours per week for their administrative tasks. Plaintiff argues that administrative responsibilities required more than 2.5 hours a week to be completed.

C.   **Plaintiff's Time Management**

Black & Decker contends that except in temporary or irregular circumstances involving understaffing or special events, the Retail

---

[3] The length of the electronic training modules varied from 5 minutes to 1 hour.

[4] Plaintiff testified that he typically spent 5 to 10 minutes everyday "synching" his PDA. However, defendant's computer records show that the amount of time plaintiff spent synching his PDA typically took between 10 to 30 seconds.

Specialists' work can be accomplished in a 40 hour workweek, which plaintiff disputes. Market Managers expect Retail Specialists to manage themselves and budget their time to perform their responsibilities within a 40-hour workweek. Plaintiff argues that this policy resulted in Retail Specialists not recording hours over 40 in order to get all their work done within that time constraint. Defendant explains that if a Retail Specialist did not have enough time allotted to complete every task at a particular store, he should accomplish what is most important at the store and make a note to accomplish the remaining activities at his next store visit.[5]

If a Retail Specialist has trouble budgeting his time for a 40-hour workweek, his Market Manager would generally train and counsel him on time management. If the problem is a lack of computer skills or tools that prevent him from completing his administrative tasks efficiently, defendant could provide computer training or make alternative arrangements. Plaintiff claims that Market Managers insist that the Retail Specialist must complete his work without recording more than 40 hours. Plaintiff's former Market Manager, Davolt, frequently did "work withs" with plaintiff at several of plaintiff's assigned stores. See Plaintiff Dep., 90:21-91:10; Davolt Decl., ¶9. When Davolt met with plaintiff at the store, he specifically discussed how to calculate how much in-store time plaintiff could spend there,

---

[5]Defendant claims that making plaintiff's Home Depot stores "fundamentally sound" should have taken approximately 3 to 4 hours per store. In addition, depending on the store and a variety of other factors, completing all of plaintiff's in-store activity should have taken him 5 to 8 hours. Plaintiff claims that it often took more than 8 hours to complete work in a store.

based on an eight-hour day, and taking into account his compensable Commute Time and administrative tasks.

### D.    Defendant's Time Reporting Policies

It is defendant's policy to compensate Retail Specialists for (a) all time spent working at Home Depot stores; (b) all time spent working at home; and (c) all travel time between stores during the workday, and all Commute Time in the morning or evening in excess of 60 miles. In addition, defendant requires Retail Specialists to accurately self-report their total hours worked on their handwritten time sheets. Further, defendant claims that it paid for all hours worked in addition to overtime hours which are paid at the appropriate overtime premium. Plaintiff contends that Market Managers remind the Retail Specialist that he must complete his work without recording more than 40 hours.

Retail Specialists are trained in their new hire orientation regarding accurately recording all hours worked on their time sheets, including overtime. As the direct supervisors of field employees, Market Managers are responsible for training, coaching and re-training Retail Specialists about Black & Decker's policy requiring accurate record keeping and to pay for all hours worked. The Human Resources department trains and re-trains the Market Managers, Regional Managers and Divisional Managers concerning these company policies twice each year. Black & Decker maintains a Code of Ethics that requires all employees to maintain the integrity of company records, explains the company's commitment to obeying all laws expressly, including all wage and hour laws, and requiring employees to report what they believe to be violations of the Code of Ethics. The Code outlines a strict no-

retaliation policy that protects employees from good faith complaints under the Code.

As part of the effort to reinforce the Code of Ethics with all employees, Black & Decker mailed a copy of a brochure entitled "Doing What's Right" to all employees on April 10, 2006, which summarized the critical aspects of the Code of Ethics. Over the following several months, Black & Decker followed up with a series of e-mails to all current employees, including all Retail Specialists, entitled "Live the Code," which focused on one of the topics addressed in the Code of Ethics. The e-mail sent to all employees on January 16, 2007 regarding "Live the Code – Accurate Business Records" provided that all employees were required to "ensure that business records (for example time cards, travel and expense reports, invoices, and purchase orders) are honest, complete and not misleading." It directed employees to "watch out for falsifying records or documents" and to beware of [a]ssisting anyone with or going along with the creation of inaccurate or misleading records." Employees were told, "If you are asked or aware of efforts to alter, destroy, conceal, falsify or not create business records, report this to your supervisor immediately. If you still have questions or concerns, e-mail [doingwhatsright@bdk.com](mailto:doingwhatsright@bdk.com)." In addition, employees were given a phone number by which they could make anonymous reports of violations. No complaint was ever made by plaintiff utilizing this process, nor was any anonymous complaint made regarding plaintiff's supervisors.

### 1.    Plaintiff's Beacon Hours

Black & Decker provided plaintiff with a hand-held PDA that he used to record his entry and exit times at each Home Depot store and to signal completion of the "task lists." Black & Decker refers to the amount of in-store time recorded by the PDA as "Beacon" hours. Black & Decker frequently received "Beacon" reports reflecting plaintiff's Beacon hours. The Regional and Market Managers take into consideration a number of factors about each store in the territory, including store volume (i.e. how busy the store is) and the store's location relative to other stores in the territory (i.e. geographical distance and travel time), when they develop expectations for the amount of in-store time expected of each Retail Specialist for each store.

The Beacon reports were one tool among several for Market Managers to evaluate Retail Specialists' performance, but they were not the most important tool. This is so because the Beacon reports were subject to inaccuracies and even employee fraud. For example, Retail Specialists were not expected to "Beacon" out of a store for breaks or meal breaks, although, they were encouraged to take both. Beacon reports would typically over state in-store hours by 2.5 to 5 hours per week due to meal periods. Moreover, if a Retail Specialist forgot to Beacon in or out of a Home Depot store, or if either the PDA or the Beacon sensors at the store were not working properly, then he could "manual" in or out from anywhere.[6] On certain days, some Retail Specialists failed to either Beacon in/out or even to "manual" in/out, because of technical

---

[6]The task lists can also be checked off as completed in the PDA from anywhere.

error, or they forgot, or because they never visited the store that day at all. Plaintiff himself had some days in which he had no Beacon hours, yet identified a full day's work on his timecard for which he was paid.

Also, a Retail Specialist could Beacon in to a store in person and then leave the store to conduct personal errands, or (as defendant has at times suspected of plaintiff) go to work for another company, while supposedly working for Black and Decker at a Home Depot store. For this reason Market Managers consistently visited the Home Depot stores to observe for themselves the status of the Black & Decker displays and products. Should a Market Manager discover that the stores had old, discontinued products, dusty products, old displays or fact tags, or lacks new displays, product information or specials, the Market Manager strongly suspected that the Retail Specialist has not actually worked in the store for the minimal amount of time required to make it "fundamentally sound." In addition, the Market Managers verify with the Home Depot store managers and department heads whether the Retails Specialists are performing and if the Home Depot Managers are satisfied with their work. On some occasions, Home Depot store managers expressed dissatisfaction with a Retail Specialist's performance, commenting that they have not seen the representative in ages. Tucker Decl., ¶18.

## 2.  Black & Decker's Policy Regarding Overtime

There is no Company policy prohibiting Retail Specialists from working, recording, and receiving compensation for overtime. While employees are expected to get prior approval before working overtime, they are paid for all hours worked, regardless. Plaintiff claims that

Black & Decker's "manage to 40 hours" policy results in Retail
Specialists not being paid overtime i.e. employees are not paid for all
hours worked. Black & Decker, however, has historically paid overtime
to Retail Specialists (including plaintiff) in every year that the
position has existed. Black & Decker's National Merchandising Manager
testified at his deposition that there is no corporate prohibition on
overtime, nor any directive to limit overtime worked by Retail
Specialists. Market Managers are not directed to monitor the amount of
overtime hours worked, or overtime dollars spent. According to
plaintiff's supervisor, Davolt, he never felt any pressure from Black
& Decker to minimize overtime. In addition, he testified that he was
never disciplined or counseled because any of his Retail Specialists
recorded overtime. Moreover, he never disciplined a Retail Specialist
for recording overtime.

### E.    Plaintiff's Performance Issues and Termination

During his nine months of employment as a Retail Specialist,
plaintiff was consistently coached and trained by his supervisors due
to his performance problems. Plaintiff frequently reported fewer than
28 in-store Beacon hours, had a number of "manual" Beacon entries, and
on some occasions, had a full day of work identified on his time card,
but no Beacon time for that day. Davolt counseled plaintiff about his
in-store hours, and frequently did "work withs" with him in order to
coach and counsel his performance. In addition, Davolt occasionally
visited plaintiff's stores in order to evaluate whether the store was
"fundamentally sound." According to Davolt, during the "work withs"
that plaintiff had with him, plaintiff lacked focus and familiarity

with his stores, which left him with the impression that plaintiff had not been in his assigned stores in some time.[7] Despite the warnings and reminders, plaintiff continued to fail to meet Davolt's expectations about performing even the most fundamental activities that were pointed out to him during the "work withs." Accordingly, Davolt issued several written disciplinary warnings and had many counseling sessions with plaintiff to discuss his job deficiencies.

Moreover, Davolt learned that plaintiff had lied to him and falsified his time records in violation of Black & Decker's policy. One morning in February 2007 on the way to a Home Depot store, plaintiff had a traffic accident. Plaintiff notified Davolt of the accident and told Davolt that he would spend time that day taking an online training course. After reviewing plaintiff's time sheet for that week, Davolt noticed that plaintiff had recorded four hours of work on the day of the accident, despite the fact that Black & Decker's computer records showed that plaintiff had not taken an online course.[8] Thereafter, Davolt asked plaintiff whether he had recorded on his time sheet and in his weekly status report that he had taken the course and plaintiff responded that he had. Davolt then confronted plaintiff by asking him exactly which course he had taken, and plaintiff was unable to provide

---

[7]Indeed, on one scheduled "work with" at one of plaintiff's assigned Home Depot stores, it appeared to Davolt that plaintiff forgot that Davolt was going to meet him. Plaintiff appeared to be totally unprepared to work in the Home Depot store that day and despite the heat, kept his pullover on, partially covering up what appeared to be a yellow polo shirt. Davolt later came to suspect that plaintiff was wearing the signature yellow shirt worn by Best Buy employees and contractors in the Best Buy stores, and that plaintiff, having forgotten about his meeting with Davolt, had intended to Beacon into the Home Depot store and then leave the store to do his moonlighting job at the nearby Best Buy.

[8]Plaintiff does not dispute this fact but explained at his deposition that he took the course the following week and not when he claimed he took it.

him with a straight answer. Plaintiff admitted falsifying his time records and was not completely truthful with Davolt about his online training. Plaintiff testified as follows:

Q: Did you actually do the online training when you went home?

A: No.

Q. Did you tell [Davolt] after that day that you did, in fact, do the online training?

A. I did.

See Plaintiff Dep., 116:10-15

Q: All right. So he asked you if you took the course and you say no, and what did...Davolt say in response?

A. He said you recorded on your weekly time or your weekly summary that you did take the course and I said, yes, I did.

Q. Did he ask you why you did that?

A. Yes.

Q. What did you say?

A. I said I thought I had taken it.

Q. Isn't it true that...Davolt actually asked you which course you took and you couldn't tell him which one?

A. He did ask me which course I did take. And at that point I did reply I did not know.

Q. You didn't know which one you had taken?

A. Correct.

See Plaintiff Dep., 118:12-119:5. According to Davolt, during a counseling session, plaintiff shared some unusual and extreme personal and family circumstances with him, which resulted in Davolt giving plaintiff more leeway than he otherwise would have given him.

Nonetheless, plaintiff's performance did not improve and he was eventually terminated.

## F.    Plaintiff's Practices Regarding Recording His Time

### 1.    Plaintiff's Off-the-Clock Claims

While plaintiff admitted that he was familiar with Black & Decker's policies regarding accurate timekeeping, he also claims that he did not record all hours worked because his supervisors told him to record only 40 hours per week irrespective of how many hours he worked. In particular, plaintiff claimed that his first supervisor at Black & Decker, Idigo, told him and others to record only 40 hours per week. Plaintiff admitted, however, that she never said that anyone should not work more than 40 hours per week but that they only record 40 hours. Further, plaintiff claims that his second Market Manager, Davolt, told him to work however many hours it took to get the job done, but to only record 40 hours per week. Davolt denies that he directed plaintiff to record only 40 hours per workweek even if he worked more than 40 hours.

### 2.    Falsification of Company Records

In order to comply with directions that he only report 40 hours per week, plaintiff claims that he falsified his time sheets. Plaintiff claims that his time sheets were accurate from Monday through Thursday, but incorrect for most Fridays.

### a.    Beacon Records, Personal Calendar and Time sheets

Plaintiff testified that he sometimes Beaconed out of the Home Depot store on Fridays but continued working. Plaintiff claimed that he did so in order to avoid raising a "company flag" signaling that he was working over 40 hours per week. Although plaintiff claims that Davolt told him to only record 40 hours on his time sheets, plaintiff has

never claimed that Davolt, or any other manager, told him to falsify his Beacon hours. On the contrary, plaintiff admits that Davolt counseled him three to four times because his Beacon hours were not high enough. Because of the disarray of the display of Black & Decker products in plaintiff's assigned stores and his low Beacon hours, Davolt suspected that plaintiff was not working the hours he alleges, or at a minimum, he was inefficient during the hours he worked.

Moreover, at his deposition plaintiff admitted that he recorded his own working time on his time sheets. He also testified that he submitted his time sheets to his supervisor for payroll processing. In addition, plaintiff admitted that his time sheets were only inaccurate on Fridays and that these inaccuracies were the direct result of his own falsification. Plaintiff explained at his deposition that he kept track of his work time daily in a personal calendar.[9] In addition, plaintiff admitted that he accurately recorded his time Monday through Thursday. After working Monday through Thursday, plaintiff tallied his time and calculated the number of hours remaining before he hit 40 hours for the workweek. On Fridays, plaintiff would try to work only the balance of the hours necessary to reach 40, but claimed that he would typically exceed that balance. Plaintiff testified that when his Friday hours exceeded 40, he revised his time on Friday downwards by recording whatever was left to get to forty hours for the week on both

---

[9]Plaintiff testified that he possessed the calendar when he commenced this lawsuit and that he believes he provided the calendar to his lawyer. Black & Decker argues that plaintiff has refused to produce the calendar in response to multiple discovery requests. Because plaintiff never produced any calendar, defendant maintains that it appears not to exist.

his personal calendar and his time sheet. Plaintiff testified as follows:

Q:    Well, you testified...if I understood you correctly, that you would keep track of that time accurately, and then on Thursday night or Friday morning you would see how many hours you had left to get to forty, and that would dictate the hours you put in for Friday?

       *       *       *

Q:    ...And I'm just trying to understand your process. So your, your testimony is that although you tracked your hours daily at the end of each day on your personal weekly calendar, you never wrote the accurate time in for each day either?

       *       *       *

A:    Yes. My calendar would end up mimicking my time sheet.

       *       *       *

Q:    How did you decide how many hours you were going to write down?

A:    Okay....The, I would write in my actual work time when I would get to Friday, then I would amend it to forty.

Q:    Okay. That's what I thought you said the first time.

A:    Okay.

Q:    Okay. SO you have a weekly personal calendar. Monday you, you really- you accurately recorded your hours for Monday that you really worked?

A:    Yes.

Q:    Same with Tuesday, Wednesday, Thursday?

A:    Yes.

Q:    And then you would see how many you had left to get to forty. And if it was, for example, only five hours, then you would revise your time on Friday so that you didn't put down more than five, is that accurate?

A:    Yes.

Q:    Okay. All right. And then you took those, the numbers you wrote down in your daily calendar, and you had to transfer them into a time sheet to submit to [Black & Decker] for payment, correct?

A:    Yes.

Q:    That is when you did the revision downward on your hours?

A:    Actually, I did the revision in my notebook and then did the revision, then copied those hours down onto the timecard.

Q:    All right. And what was your practice with respect to the notebook when you began to revise it downward, would you look back at the week and start marking down time for each day, what was your practice, or was it only Fridays that are marked down?

A:    It was Fridays that were typically changed.

Q:    Okay. That was your typical practice?

A:    Yes.

Q:    All right. So the hours would be accurate except for Friday, is that correct?

       *    *    *

A:    Yes.

Q:    Okay. So if we were to look at your time sheet, then the hours for Monday through Thursday would be accurately stated, but Friday would not be?

       *    *    *

A:    Yes.

See Plaintiff Dep., 163:18-166:20.

As a result of mis-recording his hours, plaintiff claims "a good deal" of his time records were false. He admitted that he "could not be precise on how many" of his time sheets were inaccurate when he worked for Idigo, but ultimately estimated it was about 50%. In this regard, plaintiff testified as follows:

Q:   What is your best estimate about the number of times you falsified your time cards while you worked for Ms. Idigo?

*    *    *

A:   I'm going to say approximately fifty percent.

See Plaintiff Dep., 103:1-16. In addition, plaintiff claimed that 90% of his time sheets were inaccurate under Davolt's supervision. With respect to this issue, plaintiff testified as follows:

Q:   Okay.... What are you referring to when you say I fabricated per [Davolt's] instruction each week and that was incorrect on my part, what are you referring to?

A:   Mr. Davolt and Mr. Engel, during monthly meetings and other communications, e-mails, told all of the reps that they were only to record forty hours a week, you know, no matter what they worked during that particular week. So, you know, I had been working long hours typically every week but, you know, in most cases I was putting forty down despite other totals.

*    *    *

Q:   All right. So first, you're saying that every one of your time sheets was false?

A:   A good deal of them.

Q:   Well, give me a percentage, how many of your time sheets that you submitted were false?

A:   During the weeks that I worked with Mr. Davolt, I would say ninety percent.

Q:   ....Do you mean the number, the weeks that Mr. Davolt supervised you or the weeks that he actually worked with you?

A:   From the time he was my supervisor.

See Plaintiff Dep., 100:17-101:23.

**b.  Off-the-Clock Work**

Plaintiff testified at his deposition that he told his supervisor, Davolt that he "was working over forty hours and that...it wasn't

- Page 20 -

accurate, that the 40 hours was not accurate." According to plaintiff, Davolt informed him that he was only to mark forty hours on his timecard "because we can't afford overtime, my budget can't afford overtime." In addition, plaintiff testified that Davolt and the Regional Manager, Mike Engel ("Engel"), reported in a monthly meeting to all Retail Specialists present that "their budget is very tight and they can't afford the overtime" and that the Retail Specialists were "only to put 40 hours on [their] timecard[s]." When asked whether he was told by either Davolt or Engel that he "really should be able to do his job in forty hours or less," plaintiff said he "couldn't recall."

In January 2007, Black & Decker's Vice President and General Auditor, Steve Howarth ("Howarth") sent all employees, including plaintiff, an e-mail detailing Black & Decker's expectations that all employees take responsibility for ensuring the accuracy of defendant's records, including time cards. Employees were warned not only to record time cards accurately, but to beware of, and to report, any employee who encourages or requires them to falsify their time cards. Nevertheless, after receiving this directive, including information about how to report such behavior anonymously, plaintiff was allegedly directed by Davolt to falsify his time cards. Notwithstanding the directive from Howarth to "Do What's Right" by reporting this violation of defendant's policy, plaintiff made no complaint whatsoever, either anonymously or otherwise to defendant. Plaintiff admits that other than Davolt, he did not tell any supervisor or manager that his time records were inaccurate. He also did not complain to higher management about

what Davolt allegedly told him to do in reporting his hours on his time sheets.

**DISCUSSION**

**I.    Summary Judgment Standard**

Summary judgment may be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See Matsushita v. Zenith, 475 U.S. 574, 587 (1986). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007).

**II.    Off-the-Clock Claim**

Black & Decker contends that plaintiff's off-the-clock claims fail as a matter of law because he cannot put forth sufficient evidence to prove either of the essential elements of his claim, namely: (1) the amount of uncompensated work he actually performed (see Anderson v. Mt. St. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946)) and (2) that defendant had actual or constructive knowledge of the amount of time that plaintiff was working off-the-clock. See Holzapfel v. Town of

Newburgh, 145 F.3d 516, 521 (2d Cir.1998). An employee who brings a claim for unpaid overtime under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." Anderson, 328 U.S. at 686-87; Seever v. Carrols Corp., 528 F.Supp.2d 159, 169 (W.D.N.Y.2007). Anderson and Seever provide varying burdens of proof, depending on whether the employer maintained records of the hours worked by the employee claiming unpaid overtime.

The Anderson standard maintains that where the employer has not kept records of the hours worked by an employee pursuant to the requirements of the FLSA, then the plaintiff need not prove the precise amount of work that he performed off-the-clock. The employee must still however, "produce...sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson, 328 U.S. at 687. The Court instituted this lesser standard of proof for a plaintiff under these limited circumstances as a matter of fairness stating "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would have been possible had he kept records in accordance with the requirements of" the FLSA. See id. at 688.

It should be noted that the lower burden of proof allowed under Anderson is applicable only where "an employer maintains control over the calculation and compensation of time worked and either alters or fails to keep complete time records as mandated by the FLSA, thereby placing the employee at a marked disadvantage in pursuing an FLSA claim." Seever, 528 F.Supp.2d at 170. The lesser Anderson burden of

proof is not applicable where "the time record 'deficiencies' are admittedly and voluntarily self-created." Id. In this case, defendant argues that plaintiff cannot meet his burden of proving the amount and extent of his off-the-clock work under either the higher standard provided by Seever or the lesser burden set by Anderson. See Def. Br. at 16-17. Plaintiff, on the other hand contends that the more lenient Anderson standard applies in this situation where the employer "coerced its employees to falsify their own time records." See Pl.Opp.Br. at 3.

### A. Plaintiff has failed to prove the amount of time he worked off-the-clock with specificity, which is a requirement under the Seever standard.

Black & Decker relies heavily on the Seever case, which it maintains requires a plaintiff in Kuebel's circumstances to prove specific facts that establish when and how long he worked off-the-clock where the plaintiff never previously reported such work to his employer and any inaccuracies in the time records were due to plaintiff's failure to ensure that the records accurately reported the total amount of time worked. See Seever, 528 F.Supp.2d at 170. In Seever, several former employees of a mall fast food restaurant brought suit against the company that owned their franchise, along with some 349 other such franchises, alleging that their employer failed to pay them wages that they were legally entitled to under the FLSA. See Seever, 528 F.Supp.2d at 162. The ten plaintiff employees in Seever sought the conditional certification of an FLSA collective action and notice to a nationwide class estimated to be over 100,000 employees. Part of the plaintiffs' claims included the allegation that the defendant employer, Carrols

Corporation, had failed to compensate them for work performed off-the-clock, as well as time spent undergoing training and attending managers' meetings. See id. at 162.

When faced with the claims of the ten plaintiffs for off-the-clock work for which they were not compensated, and which their defendant employer was unaware, the district court in Seever observed that the plaintiffs' claims were supported solely by the testimony of the plaintiffs themselves, comprised largely of nebulous recollections of tasks each individual might have performed off-the-clock, which vary dramatically between the plaintiffs and were uncorroborated by any other evidence. See Seever, 528 F.Supp.2d at 169. After analyzing the inconsistent and vague nature of each plaintiff's testimony, the court in Seever concluded that based on the plaintiffs' inability to provide specific facts establishing when, and for how long, each performed the off-the-clock tasks for which they sought compensation, and the undisputed fact that plaintiffs never reported this work on their time sheets, and their allegations rest solely on their own bare recollections, plaintiffs could not meet their ultimate burden to demonstrate that they performed work for their employer about which their employer was aware and for which they were not compensated. As such, plaintiffs' claims with respect to uncompensated off-the-clock work were dismissed. See id. at 170.

In the instant case, any inaccuracies in plaintiff's time sheets are not due to defendant's failure to keep accurate records, but "solely due to [plaintiff's] deliberate failure to accurately record

the time [he] worked." Seever, 528 F.Supp.2d at 170 (emphasis in original). Here, plaintiff claims he falsified his own time records, admitting 50% of the time with supervisor Idigo and 90% of the time with supervisor Davolt. Accordingly, any inaccuracies in Black & Decker's records are due to plaintiff's deliberate failure to accurately record the time he worked. Plaintiff argues that he need not satisfy the requirement that he must prove his off-the-clock work with specificity claiming that he was instructed by his supervisors not to record over 40 hours per week. See Pl. Opp. Br. at 3. This same argument was unavailing in Seever and is unpersuasive in this case. In Seever, the Court was unpersuaded by the plaintiff's claim that her supervisor directed her to perform work before she clocked in and after she clocked out, when she was responsible for recording her own time and the company had established procedures and policies requiring accurate time keeping and pay for all hours worked. See id. at 171-72. Similarly, Black & Decker has established practices, policies and procedures for accurate timekeeping and payment for all hours worked, and plaintiff was responsible for preparing his own time records. On the single occasion when plaintiff's time sheet showed overtime, he was paid overtime for the work performed. Accordingly, similar to the Seever case, plaintiff's claim that his supervisor told him not to record all hours worked is "ultimately immaterial, since there is no evidence that [his supervisor's] alleged 'instruction' ever prevented [him] from claiming, and being paid for, all of the time [he] worked." Seever, 528 F.Supp.2d at 171.

**B.    Plaintiff cannot prove his off-the-clock work even under the <u>Anderson</u> standard**

The <u>Anderson</u> decision holds that when an employer has failed to keep accurate or adequate time records, an employee may satisfy his burden to show that he performed off-the-clock work if he produces evidence to generally show the amount and extent of the uncompensated work "as a matter of just and reasonable inference." <u>Anderson</u>, 328 U.S. at 687-88. This lesser burden, as the court noted in <u>Anderson</u>, may be satisfied by the sole testimony of the complaining employee based on his or her recollection alone. Should the employee satisfy this reduced standard to make her prima facie case, then under <u>Anderson</u>, the burden shifts to the employer to produce evidence to negate the reasonableness of the inference drawn from the evidence provided by the plaintiff employee. <u>See</u> <u>Seever</u>, 528 F.Supp.2d at 170. Should the defendant employer fail to produce evidence to rebut the employee's prima facie case, the court may award the plaintiff employee damages even if such damages must be approximated. <u>See</u> <u>id.</u>

At his deposition plaintiff admitted that he "could not be precise how many" of his time sheets were inaccurate when he worked under his first manager, Idigo, but ultimately estimated about 50% were inaccurate. Thereafter, plaintiff testified that 90% of his time records were inaccurate under his second supervisor, Davolt. While plaintiff does not dispute any of these facts, he submitted a declaration in support of his opposition to defendant's motion for summary judgment stating that "[t]o the best of my memory, I average from one to five hours of uncompensated overtime per week." <u>See</u>

Declaration of Greg Kuebel, ¶3 attached to the Affirmation of Alan G. Crone as Ex. D. Plaintiff's declaration is an attempt to establish his damages as a matter of just and reasonable inference. In this regard, he is now claiming off-the-clock work for every week of his employment. This is a direct contradiction of his deposition testimony that approximately 50% of his time records were accurate. Assuming the more lenient <u>Anderson</u> standard was applicable, plaintiff has failed to meet the lesser burden because the only testimony he has provided estimating his unpaid off-the-clock time contradicts his deposition testimony. Accordingly, plaintiff's recent affidavit cannot create a genuine triable issue of material fact rescuing his off-the-clock claim from summary judgment.[10] <u>See</u> <u>Henneberger v. Cohen & Slamwitz, LLP</u>, 2010 WL 1405578 at *4 (W.D.N.Y.2010) ("factual issues created solely by an affidavit crafted to  oppose a summary judgment motion are not 'genuine' issues for trial") quoting <u>Hayes v. New York City Dep't of Corrections</u>, 84 F.3d 614, 619 (2d Cir.1996).

Moreover, assuming arguendo that plaintiff has adequately created an inference that he worked off-the-clock, Black & Decker has produced sufficient evidence to negate the inference that the plaintiff had performed work off-the-clock. <u>See</u> <u>Seever</u>, 528 F.Supp.2d at 171-72. The inference is negated by Black & Decker's undisputed evidence of its:

---

[10]Even if this Court were to give credence to plaintiff's conclusory declaration testimony approximating the he "averaged from one to five hours of uncompensated overtime per week," this is simply too *deminimis* to permit the Court to make a just and reasonable inference as to the number of uncompensated hours plaintiff worked. Plaintiff also relies on previously filed statements from other Retail Specialists who made statements about the number of hours that they recorded on their time sheets, what they were told (or inferred) from their managers, and about the number of overtime hours they claim they were allegedly not compensated. This testimony however, is not relevant to whether plaintiff's individual claim that he worked off-the-clock has any merit.

(1) established written policies and training materials stating that all time worked must be accurately recorded and compensated, (2) plaintiff's own time records, and (3) Beacon records showing that plaintiff worked less than 40 hours per week.[11] Accordingly, in light of these facts relating to the off-the-clock claim, even had the more relaxed <u>Anderson</u> test been applied, the plaintiff could not as a matter of law rebut the showing made by defendant that negated his "just and reasonable inference" that he had worked off-the-clock without pay. Therefore, Black & Decker's motion for summary judgment dismissing plaintiff's off-the-clock claim is granted.

Finally, plaintiff cites several cases in an attempt to evade <u>Seever's</u> heightened standard. These cases however, are distinguishable in that the employers' policies and procedures at issue prevented the employees from being paid overtime even if the employees recorded it, a critical fact that undisputedly does not exist in this case. For instance, in <u>Harris v. Surrey Vacation Report, Inc.</u>, 2008 WL 2906737 (W.D.Mo.2008), the court acknowledged that "[a]s a general matter, an employee cannot claim overtime pay with regard to time records the employee falsified." <u>Id.</u> at *9. The cases cited by plaintiff do not stand for the proposition that plaintiff can avoid proving his

---

[11]Defendant contends that plaintiff's silence on this issue indicates that he has abandoned this claim. <u>See</u> Def. Reply Br. at 6. In <u>Taylor</u>, the court stated that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." <u>See Taylor</u>, 269 F.Supp.2d at 75. In the present case, the defendant moved for summary judgment, but the plaintiff did not address the defendant's arguments concerning this issue in its response to the motion for summary judgment. As a result of the plaintiff's failure to respond, the court finds that the plaintiff abandoned this specific claim relating to Black & Decker's negation of the inference created by plaintiff. Thus, defendant's motion for summary judgment with respect to those claims are granted. <u>See id.</u> (court noted that summary judgment could be granted when the court found a claim to be abandoned).

uncompensated overtime with specificity simply by alleging that his supervisor told him to record 40 hours per week. Given <u>Seever's</u> explicit rejection of this proposition, plaintiff bears the burden of proving his uncompensated overtime with specificity. <u>See Seever</u>, 528 F.Supp.2d at 170. This Court finds that plaintiff has not explained when and for how long, he performed the off-the-clock work. Thus, because the undisputed facts demonstrate that plaintiff has failed to meet his burden, his claims for off-the-clock work fail as a matter of law.

### C.   Actual or Constructive Knowledge of the Off-the-Clock Claim

Case law in this Circuit instructs that an "employee...is only entitled to compensation for those hours of work of which the employer had actual or constructive knowledge." <u>See</u> <u>Singh v. City of New York</u>, 418 F.Supp.2d 390, 397 (S.D.N.Y.2005); <u>Holzapfel v. Town of Newberg</u>, 145 F.3d 516, 521 (2d Cir.1998) (plaintiff must prove "how much of that time was spent with the employer's actual or constructive knowledge"). Accordingly, plaintiff may only recover for those unpaid overtime hours of which Black & Decker was aware. Black & Decker argues that plaintiff has not attempted to prove which alleged off-the-clock hours defendant and its managers were aware of. <u>See</u> Def. Br. at 19. Defendant further states that plaintiff tries to demonstrate that Black & Decker had actual or constructive knowledge because he was directed to not record over 40 hours per week and that he complained to one of his supervisors, Davolt that he was working more than 40 hours per week but

only recorded that he worked 40.[12] The Court finds that these generalized statements by plaintiff fail to satisfy the legal requirement that he prove how much work off-the-clock was done with Black & Decker's knowledge. Accordingly, plaintiff has failed to identify a triable issue of material fact.

Moreover, plaintiff tries to strengthen his claim by providing various statements of other Retail Specialists that they were told only to record 40 hours per week. Initially, this argument fails because the testimony is specific to these individuals' employment and not plaintiff. Further, even assuming their statements are true, they do not make it more likely that defendant had actual or constructive knowledge that plaintiff himself was working off-the-clock. It is undisputed that there was a company wide written policy concerning accurately recording all hours worked on ones time sheets, including overtime. Indeed, Black & Decker maintains a Code of Ethics that requires all employees to maintain the integrity of company records, explains the company's commitment to obeying all laws expressly, including all wage and hour laws, and requiring employees to report what they believe to be violations of the Code of Ethics. As part of the effort to reinforce the Code of Ethics with all employees, Black & Decker mailed a copy of a brochure entitled "Doing What's Right" to all employees on April 10, 2006, which summarized the critical aspects of the Code of Ethics.

---

[12]It is undisputed by plaintiff that it appeared to Davolt that plaintiff was actually working fewer than 40 hours per week as a result of the unkempt nature of his stores and his Beacon reports.

Black & Decker sent out a series of e-mails to all current employees, which focused on topics addressing the Code of Ethics. In fact, an e-mail sent to all employees in January 2007 regarding accurate business records provided that all employees were required to "ensure that business records (for example time cards, travel and expense reports, invoices, and purchase orders) are honest, complete and not misleading." It directed employees to "watch out for falsifying records or documents" and to beware of [a]ssisting anyone with or going along with the creation of inaccurate or misleading records." Employees were told, "If you are asked or aware of efforts to alter, destroy, conceal, falsify or not create business records, report this to your supervisor immediately[.]" In addition, employees were given an e-mail address and phone number by which they could make anonymous reports of violations. Significantly, no complaint was ever made by plaintiff through this process, nor was any anonymous complaint made regarding plaintiff's supervisors. Based on these undisputed facts, plaintiff cannot meet his burden of proving that Black & Decker had actual or constructive knowledge of the hours he worked off-the-clock. Accordingly, his overtime claims under federal and state law fail as a matter of law and thus are dismissed on summary judgment.[13]

**III. <u>Expert Testimony</u>**

Plaintiff has provided an expert report from William J. Cutler ("Cutler") for the first time in his opposition to defendant's summary

---

[13]Plaintiff tries to strengthen his claim of Black & Decker's actual and constructive knowledge by providing for the first time an expert report by a William Cutler, Jr. who claims that defendant's "'manage to 40 hours policy' ...resulted in knowingly and deliberately preventing and limiting Plaintiffs from accurately recording their time." <u>See</u> Declaration of William Cutler, Jr. ("Cutler Dec.") This will be addressed in Point III below.

judgment motion. Cutler opines in his declaration[14] that the "manage to 40 hours" policy "resulted in knowingly and deliberately preventing and limiting Plaintiffs from accurately recording the total amount of compensable amount of time worked" and "is a willful violation of the FLSA." See Cutler Decl., ¶5. Defendant argues that Cutler's expert report consists of legal conclusions, which cannot support plaintiff's off-the-clock claims or a showing of willfulness. See Def. Reply Br. at 7-8. In addition, defendant contends that Cutler's opinion is unreliable and speculative and on this basis should be excluded. See id. at 8. Further, defendant claims that Cutler's opinions must be excluded since they are irrelevant to the issues before the Court. See id. at 9.

A court maintains full discretion to determine whether expert testimony will be admitted. See United States v. Duncan, 42 F.3d 97, 101 (2d Cir.1994) (citing United States v. Schwartz, 924 F.2d 410, 425 (2d Cir.1991)). The Federal Rules of Evidence "provide a liberal standard for the admissibility of expert testimony." United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir.2003) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993)). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

---

[14]It is significant to note that these opinions are not included in Cutler's expert report and are only included in his declaration in support of the summary judgment motion. See Cutler Decl., ¶5.

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R.Evid. 702.[15] Accordingly, it is reasonable to conclude that an opinion by an expert that is "without factual basis and [is] based on speculation or conjecture [is]...inappropriate material for consideration on a motion for summary judgment." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir.2008)

Cutler opines that in his professional opinion "[d]efendant established and routinely implemented a policy termed the 'manage to 40 hours' policy." See Cutler's Expert Report at 41. He further opines that "[d]efendant's implementation of the 'manage to 40 hours' policy by Defendant's supervisory personnel resulted in the plaintiff's not recording and not being paid for all compensable time worked by the plaintiffs." See id. at 42. In addition, Cutler opines in his declaration that the "manage to 40 hours" policy "resulted in knowingly and deliberately preventing and limiting Plaintiffs from accurately recording the total amount of compensable amount of time worked" and "is a willful violation of the FLSA." See Cutler Decl., ¶5. To support his opinion, Cutler has not provided dates, studies, documents,

---

[15]In Daubert, 509 U.S. at 589, the Supreme Court held that trial courts must perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The Supreme Court's subsequent decision in Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) clarified that Daubert's "general 'gatekeeping' obligation [] applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (citing Fed.R.Evid.702). The standard set forth in Rule 702 embodies both of these principles. See Highland Capital Mgmt., L.P., 379 F.Supp.2d at 467-68.

articles or other information beyond his "professional opinion" that there exists a "manage to 40 hours" policy, which prevents plaintiffs from accurately recording the total amount of compensable time worked. This opinion is speculative at best. In addition, Cutler has not sufficiently explained his basis for inferring a finding that plaintiff worked off-the-clock and did not report it because defendant requested its Retail Specialists to manage their workweek to 40 hours. No allowance is made by Cutler for plaintiff's failure to truthfully report his time. Accordingly, Cutler cannot demonstrate that his conclusions are based on a reliable rationale for plaintiff's failure to accurately report his time. See Walsh v. City of New York, 2008 WL 857763, at *14 ("Reference to case studies should be excluded where they fail to contain statistically significant data regarding the causation at hand").

Courts in this Circuit have repeatedly held that while an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir.1991); see also DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir.2005) (expert inappropriately drew legal conclusions by opining that plaintiff's actions amounted to extortion); United States v. Scop, 846 F.2d 135, 142 (2d Cir.), rev'd in part on other grounds, 856 F.2d 5 (2d Cir.1988) (expert witness statement "embodying legal conclusion exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence"); Hygh, 961 F.2d at 363 ("This circuit is in accord

with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion"); see also Andrews v. Metro North Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir.1989) (holding that engineer's testimony that defendant was negligent was an improper legal conclusion). Thus, proffered testimony that expresses a "legal" conclusion is properly excluded. See Hygh, 961 F.2d at 363; see also Bilzerian, 926 F.2d at 1294.

Here, Cutler's opinions are framed as legal conclusions when he unequivocally states that the "manage to 40 hours" policy "resulted in knowingly and deliberately preventing and limiting Plaintiffs from accurately recording the total amount of compensable amount of time worked" and that such policy "is a willful violation of the FLSA." Likewise, his opinion that the "manage to 40 hours" policy resulted in individuals being denied overtime pay, amounts to a legal conclusion based on his interpretation of the facts. See Scop, 846 F.2d at 139, 142 (Rule 704 "was not intended to allow experts to offer opinions embodying legal conclusions," which "encroach upon the court's duty to instruct on the law[.]") In sum, the Court will disregard plaintiff's expert report since the Court finds that the opinion is inadmissible, irrelevant and couched as legal conclusions.

### IV.  Willful Violations of the FLSA

### A.  Statute of Limitations

Defendant argues that a two-year statute of limitations should apply to the instant case, rather than the three-year limitations period. See Def. Br. at 20; see also 29 U.S.C. § 255(a) (FLSA provides for a two-year statute of limitations). The two-year limitations period

may be extended to three years for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a); see also Herman v. RSR Sec. Servs., Ltd., 172 F.3d 132, 141 (2d Cir.1999). To benefit from the three-year statute of limitations, plaintiff bears the burden of proving "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." See Herman, 172 F.3d at 141 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988)); see also Reich v. Waldbaum, Inc., 52 F.3d 35, 39 (2d Cir.1995) (Employer does not act willfully even if it acts unreasonably in determining whether it is in compliance with the FLSA).

Plaintiff's only support for his claim that Black & Decker acted "willfully" is the expert opinion of Cutler indicating that "[d]efendant's 'manage to 40 hours' policy...is a willful violation of the FLSA[.]" See Pl. Br. at 5. As discussed above, Cutler's expert opinion is not admissible and accordingly plaintiff has failed to demonstrate an issue of fact in support of his claim that defendant willfully violated the FLSA as well as the NY Labor Law. In addition, independent of the expert report, plaintiff cannot meet his burden of proving that Black & Decker willfully violated either the FLSA or the NY Labor Law.

The evidence reveals that defendant maintained a policy consistent with the law of compensating Retail Specialists for all time worked. Indeed, plaintiff was paid for all the overtime he recorded during his employment with Black & Decker. The sole conduct that plaintiff can attempt to prove is a failure to pay him for time worked that he himself obscured from Black & Decker due to his admitted falsification

- Page 37 -

of his time records. Due to the nature of plaintiff's job as a field employee, defendant has to rely on the accuracy of plaintiff's self-reported working hours. In addition, when plaintiff's manager had an opportunity to observe him, it was clear plaintiff was not under-reporting his hours on his time sheets. Indeed, during his nine months of employment as a Retail Specialist, plaintiff was consistently coached and trained by his supervisors due to performance problems. In this regard, he frequently reported fewer than 28 in-store Beacon hours. Plaintiff even admits that Davolt counseled him three to four times because his Beacon hours were not high enough. Moreover, there is nothing in plaintiff's time records or the Beacon reports to inform defendant that plaintiff was working off-the-clock.

Further, in January 2007 Black & Decker sent all its employees, including plaintiff, an email detailing Black & Decker's expectations that all employees take responsibility for ensuring the accuracy of their time records, including time cards. Employees were cautioned to record time cards accurately, and to beware of, and to report, any employee who encourages or requires them to falsify their time cards. Nevertheless, after receiving this directive, including information about how to report such behavior anonymously, plaintiff was allegedly directed by Davolt to falsify his time cards. Notwithstanding the directive from Black & Decker to report a violation of defendant's policy, plaintiff made no complaint whatsoever, either anonymously or otherwise. Plaintiff admits that other than Davolt, he did not tell any supervisor or manager that his time records were inaccurate. He also did not complain to higher management about what Davolt allegedly told

him to do with his time sheets and reporting hours worked. Plaintiff has failed as a matter of law in presenting evidence that defendant knew that it was violating the FLSA. Therefore, defendant's motion for summary judgment is granted.

**B.   Liquidated Damages Under the NY Labor Law**

"New York Labor Law provides...for [25%] liquidated damages in overtime compensation claims, in addition to federal liquidated damages." Do Yea Kim v. 167 Nail Plaza, 2008 WL 2676598, at *3 (S.D.N.Y.2008); see also N.Y. Lab. Law §663. "A violation of the New York Labor Law is willful, warranting an award of...liquidated damages in addition to lost wages, where the employer 'knowingly, deliberately, [or] voluntarily' disregards its obligation to pay wages." Ling Nan Zheng v. Liberty Apparel Co., Inc., 2009 WL 1383488, at *1 (S.D.N.Y.2009) (citing Ayres v. 127 Rest. Corp., 12 F.Supp.2d 305, 309 (S.D.N.Y.1998) (quoting P&L Group, Inc. v. Garfinkel, 541 N.Y.S.2d 535, 537 (2d Dep't 1989)) (alteration in original). "The burden of proof rests on the employee to make an affirmative showing that the employer's conduct was willful." Do Yea Kim, 2008 WL 2676598, at *3.

As already discussed in connection with the statute of limitations under FLSA, the Court finds that plaintiff has failed to establish a willful violation of the FLSA by defendant. Since the standard for willfulness for purposes of the FLSA statute of limitations does not appreciably differ from the standard applicable under New York law when determining whether to award liquidated damages (see Moon v. Kwon, 248 F.Supp.2d 201, 235 (S.D.N.Y.2002), the Court concludes that plaintiff's

claim that Black & Decker acted willfully for purposes of liquidating damages fails for the same reasons discussed above regarding the FLSA.

**V.    Remaining Motions**

There are two remaining motions pending. The first is defendant's Motion For Notice to Opt-In Collective Action Plaintiffs informing them that the collective action claims brought by Kuebel have been decided in defendant's favor and that the collective action claims have been dismissed (defendant's "Notice to Opt-In motion"). The second pending motion is plaintiff's Motion for Supplemental Notice to Putative Plaintiffs seeking permission to send supplemental notice to all Retail Specialists and Sales and Marketing Specialists employed by Black & Decker to inform them of the "off-the-clock" claim by Kuebel (plaintiff's "Supplemental Notice motion"). Because the Court has granted defendant's Motion for Summary Judgment pursuant to Rule 56, the Court need not consider these two pending motions since they are now moot.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety pursuant to Federal Rule of Civil Procedure 56 and accordingly plaintiff's Complaint is dismissed in its entirety with prejudice. Defendant's Motion For Notice to Opt-In Collective Action Plaintiffs and plaintiff's Motion for Supplemental Notice to Putative Plaintiffs are denied as moot.

**ALL OF THE ABOVE IS SO ORDERED.**

> s/Michael A. Telesca
> MICHAEL A. TELESCA
> United States District Judge

Dated:     Rochester, New York
           May 12, 2010